**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

CMI ROADBUILDING, INC. and CMI
ROADBUILDING, LTD.,

          Plaintiffs,

vs.

IOWA PARTS, INC.,

          Defendant.

No. 16-CV-33-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.      **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.     **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **5**

      *A.*     *The Parties and Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      *B.*     *CMI's Business Practices* . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
      *C.*     *Iowa Parts's Formation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

VI.    **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

      *A.*     *The DTSA and UTSA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**
      *B.*     *Statute of Limitations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
             *1.*     *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
             *2.*     *Actual or Inquiry Notice* . . . . . . . . . . . . . . . . . . . . . **20**
      *C.*     *Conversion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**
      *D.*     *Unjust Enrichment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

VII.   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **31**

## I. INTRODUCTION

The matters before the court are Plaintiffs CMI Roadbuilding, Inc. and CMI Roadbuilding, Ltd.'s (collectively, "CMI Roadbuilding") "Motion for Partial Summary Judgment" ("CMI Motion") (docket no. 134) and Defendant Iowa Parts, Inc.'s ("Iowa Parts") "Motion for Summary Judgment" ("Iowa Parts Motion") (docket no. 139).

## II. RELEVANT PROCEDURAL HISTORY

On April 11, 2017, CMI Roadbuilding filed a Second Amended Complaint (docket no. 81) against Iowa Parts and Climate Engineers, Inc. ("Climate Engineers") alleging the following: (1) Iowa Parts and Climate Engineers violated the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, by converting CMI Roadbuilding's trade secrets; (2) Iowa Parts and Climate Engineers violated the Iowa Uniform Trade Secrets Act ("UTSA"), Iowa Code Ch. 550, through continued use and disclosure of CMI Roadbuilding's trade secrets; (3) Iowa Parts and Climate Engineers converted, under common law, CMI Roadbuilding's trade secrets; and (4) Iowa Parts and Climate Engineers were unjustly enriched, under common law, by their taking of CMI Roadbuilding's trade secrets. On April 25, 2017, Iowa Parts filed an Answer (docket no. 84) generally denying liability and alleging a counterclaim for abuse of process. On April 26, 2017, the parties stipulated to the dismissal of Climate Engineers from the instant action. *See* Joint Stipulation of Dismissal With Prejudice (docket no. 85). On June 30, 2017, the court dismissed Iowa Parts's counterclaim. *See* June 30, 2017 Order (docket no. 122) (accepting Chief United States Magistrate Judge C.J. Williams's June 8, 2017 Report and Recommendation (docket no. 116) recommending that the court dismiss Iowa Parts's counterclaim). Accordingly, the four claims asserted in the Second Amended Complaint are the only remaining claims, and they remain pending only against Iowa Parts.

On September 11, 2017, CMI Roadbuilding filed the CMI Motion. On October 3, 2017, Iowa Parts filed a Resistance ("Iowa Parts Resistance") (docket no. 146) to the CMI

Motion.  On October 10, 2017, CMI Roadbuilding filed a Reply ("CMI Reply") (docket no. 147).  On November 20, 2017, Iowa Parts filed a Sur Reply (docket no. 159) with leave of court.

On September 12, 2017, Iowa Parts filed the Iowa Parts Motion.  On October 3, 2017, CMI filed a Resistance ("CMI Resistance") (docket no. 144) to the Iowa Parts Motion.  On October 12, 2017, Iowa Parts filed a Reply ("Iowa Parts Reply") (docket no. 150).  Both parties request oral arguments on the Motions, but the court finds that oral arguments are unnecessary.  The matters are fully submitted and ready for decision.

### III.  SUBJECT MATTER JURISDICTION

The court has original jurisdiction over the DTSA claim because it arises under the United States Code.  *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over the UTSA and common law claims because they are so related to the claim within the court's original jurisdiction that they form part of the same case or controversy.  *See* 28 U.S.C. § 1367(a) ("[T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . .").  In other words, "the federal-law claim[] and state-law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063, 1067 (8th Cir. 1996) (second alteration in original) (quotation marks omitted) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988)).

### IV.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts' . . . ." *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy." *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (quoting *Putman v. Unity*

*Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)).  Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010).

## V.  RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving parties, and affording them all reasonable inferences, the uncontested material facts are as follows.

### A.  The Parties and Players

CMI Roadbuilding, Inc. and CMI Roadbuilding, Ltd. are the current owners of a series of assets related to the manufacturing of asphalt plants, concrete plants and landfill and dirt compaction equipment.  *See* Second Amended Complaint ¶ 15.   CMI Roadbuilding came to own these assets via a series of corporate mergers and acquisitions stemming from a company known as Iowa Manufacturing Company, established in approximately 1929, and which changed its name to Cedarapids, Inc. ("Cedarapids") in 1985. *Id.* ¶ 8.  In 1989, Cedarapids acquired Standard Havens, Inc. ("Standard Havens"), which manufactured asphalt paving equipment and asphalt plans. *Id.* ¶ 9. This acquisition included all of Standard Havens's assets, including its intellectual property.  *Id.*  In 1999, Terex Corporation ("Terex") and its related corporations acquired Cedarapids, succeeding in ownership to all of Cedarapids's intellectual property and assets, including those assets that Cedarapids had acquired from Standard Havens ten years prior.  *Id.* ¶ 10.  In 2001, the Terex family of corporations acquired CMI Corporation, a company based in Oklahoma City, Oklahoma.  *Id.* ¶¶ 11-12.  The resulting wholly owned subsidiary was known as CMI Terex.  In 2013, CMI Roadbuilding purchased assets from the Terex family of corporations relating to the asphalt plants, concrete plants and landfill and dirt compaction equipment.  *Id.* ¶ 15.  These assets included intellectual property owned by Terex and its related corporations relating to Cedarapids, Standard Havens and CMI Corporation's line of asphalt plants.  *Id.*  Thus, CMI Roadbuilding is in the business of

manufacturing and selling asphalt plants and related equipment, including the sale of replacement parts for such plants. *See* CMI Motion Statement of Facts (docket no. 146-1) ¶ 19.

Iowa Parts is a corporation organized and existing under the laws of the State of Iowa with its principal place of business in Cedar Rapids, Iowa. *Id.* ¶ 13. Iowa Parts was incorporated in 2002 to sell replacement parts previously designed and manufactured by Standard Havens, Cedarapids, CMI Corporation and Terex. *Id.* ¶ 14.

### B. CMI's Business Practices

At issue in this case are certain technical drawings, plans and specifications which the parties refer to as "Engineering Documents." These drawings, plans and specifications are all purportedly required to manufacture an asphalt plant and the component parts thereof. *See* Brief in Support of the CMI Motion[1] (docket no. 153-1) at 4-5. Not at issue are certain documents referred to as "Gray Books," which are distributed to customers, contain drawings, including layout drawings, of CMI Roadbuilding's machinery and are supposedly intended to assist with ordering replacement parts. *See* Iowa Parts Statement of Additional Facts (docket no. 146-2) ¶ 67-69; *see also* CMI Response to Iowa Parts Statement of Additional Facts (docket no. 147-2) at 7.

Shortly after Terex acquired Cedarapids in 1999 it significantly downsized its operations, from approximately 1,200 employees to 200 employees. *See* Iowa Parts Statement of Additional Facts ¶ 14. At that time, Terex informed Jay King, Terex's parts manager, that it would no longer support the after-market parts department of the operation and the company was going to seek outside vendors to build replacement parts for the

---

[1] After CMI Roadbuilding filed the CMI Motion, it informed the court that it had erroneously omitted a page from its brief in support of the CMI Motion. The court permitted the substitution of the amended brief over Iowa Parts's objection and permitted Iowa Parts to file the Sur Reply in response. *See* November 15, 2017 Order (docket no. 155).

asphalt plant line. *Id.* ¶ 15. As a result, the parts department began to outsource as rapidly as possible in order to maintain its supply of replacement parts for its customers. *Id.* ¶ 16. This required CMI to send out packets of drawings containing specifications for certain parts to multiple vendors on a daily basis. *Id.* ¶ 16. At least some of the drawings that CMI sent out to vendors, either at that time or at some later time, bore a nomenclature identifying Iowa Manufacturing Company, Cedarapids, CMI Corporation, Terex or CMI Roadbuilding as the owner of the drawing and its contents. *See* CMI Motion Statement of Facts ¶¶ 3-4; *see also* CMI Motion Appendix[2] at 64. The parties dispute whether such vendors were required to sign confidentiality agreements upon the receipt of the Engineering Documents. *Compare* Iowa Parts Statement of Additional Facts ¶¶ 89-90, *with* CMI Response to Iowa Parts Statement of Additional Facts at 9.

### C. Iowa Parts's Formation

On April 12, 2002, Michael Hawkins, the former head of the parts department for Standard Havens, formed Iowa Parts. *See* CMI Motion Statement of Facts ¶ 14; *see also* Iowa Parts Motion Statement of Facts (docket no. 139-2) ¶ 2; Iowa Parts Statement of Additional Facts ¶ 5. Iowa Parts is in the business of selling replacement parts for, among other things, asphalt plants designed and manufactured by Standard Havens, Cedarapids, CMI Corporation and Terex. *See* CMI Motion Statement of Facts ¶ 14. It does not manufacture any of its own parts, but instead contracts with various vendors to manufacture such parts, and then sells the replacement parts to owners of Cedarapids, Standard Havens and CMI Corporation asphalt plants and equipment. *Id.* ¶¶ 15-16. Iowa Parts also does not employ any mechanical or electrical engineers, nor does it require that

---

[2] CMI Roadbuilding has filed its appendix in support of the CMI Motion in separate but consecutively paginated documents at docket nos. 134-4 through 134-19 and docket no. 137. The court shall cite to such consecutive pagination when referring to the CMI Appendix in this Order.

any mechanical or electrical engineer verify any plans or specifications that it uses to produce its replacement components. *Id.* ¶¶ 22-23.

Iowa Parts markets its replacement parts as specifically fitting and being compatible with Cedarapids, Standard Haven and CMI Corporation asphalt plants and equipment. *Id.* ¶ 17. It also holds such parts out as meeting "OEM [original equipment manufacturer] specifications," though Iowa Parts has never explicitly obtained approval from CMI Roadbuilding for such a statement. *Id.* ¶ 18. In fact, Iowa Parts advertises that it employs several people who specialize in Cedarapids and Standard Havens asphalt plants and equipment. *Id.* ¶ 21. Iowa Parts has maintained a website since July of 2011 which advertises that it can provide parts to OEM specifications, including for Standard Havens equipment. *See* Iowa Parts Motion Statement of Facts ¶ 21; *see also* Iowa Parts: Asphalt Plant Equipment, http://www.iowapartsusa.com/ (last visited Dec. 2, 2017).

Iowa Parts employs several persons who used to work for CMI Roadbuilding's predecessors in interest in the assets and intellectual property at issue in this case. From November of 1997 to April of 2002, King was employed by Cedarapids and, after Cedarapids's acquisition, Terex, in the engineering department of their asphalt plant division. *See* CMI Motion Statement of Facts ¶ 24. Soon after King left Terex, he joined Iowa Parts as the general manager. *Id.* ¶ 25. From September of 1995 to sometime in 2003 or 2004, Timothy Franck worked for Cedarapids and, after Cedarapids's acquisition, Terex. *Id.* ¶ 26. Franck subsequently left Terex and eventually gained employment with Iowa Parts. *Id.* ¶ 28. Rick Merritt worked for Iowa Manufacturing and, after it was renamed, Cedarapids as a draftsman in the engineering department's asphalt plant area. *Id.* ¶ 29. After leaving employment with Terex, Merritt went to work for Iowa Parts. *Id.* ¶ 30. Besides King, Franck and Merritt, Iowa Parts employs "many" former employees of CMI and its predecessors. *See* Iowa Parts Motion Statement of Facts ¶ 34.

When Iowa Parts first incorporated, it lacked any plans, blueprints or specifications of any kind. *See* Iowa Parts Statement of Additional Facts ¶ 24. Instead, in order to build products, Iowa Parts approached certain vendors who had advised that they were willing to manufacture products for Iowa Parts. *Id.* ¶ 25. At no time did any representative from Iowa Parts actually obtain the Engineering Documents from CMI Roadbuilding or any related corporation. *See* Iowa Parts Statement of Additional Facts ¶ 99. Subsequently, some of those vendors provided certain drawings from CMI Roadbuilding and its predecessors to Iowa Parts. *See* Iowa Parts Motion Statement of Facts ¶ 26. For other components, Iowa Parts reverse engineered CMI Roadbuilding's components using a string line and measuring tape. *Id.* ¶ 27.

On May 29, 2002, shortly after Iowa Parts was founded and King gained employment there, Terex sent King a letter. *See* Iowa Parts Motion Appendix (docket no. 139-3) at 53. The letter generally informs King that he has continuing duties of confidentiality to Cedarapids and Terex. *Id.* In relevant part, the letter reads as follows:

> [W]e wish to remind you at this time of your obligations with respect to Cedarapids' and CMI Terex's proprietary information and other property. As we are sure you are aware, all former employees owe a duty of loyalty to their former employers. All Cedarapids' [sic] and CMI Terex employees (current and former) are obligated to keep Cedarapids' and CMI Terex's proprietary and confidential information in confidence and to use such information . . . solely for Cedarapids' and CMI Terex's benefit.
>
> Further, applicable federal law makes it a crime for either an individual or an entity such as Iowa Parts to take any Cedarapids' or CMI Terex's trade secrets without authorization. If you have divulged any such information to Iowa Parts, or used this information in any way other than pursuant to your employment with Cedarapids and CMI Terex, this is a violation of law. You must immediately cease using such information and return any such property to Cedarapids and CMI Terex.

9

*Id.* The letter further states that Iowa Parts's use of the phrase "a Cedar Rapids Iowa Company" as part of its letterhead was improper as it would lead customers to believe that Iowa Parts was affiliated with Cedarapids. *Id.* at 54. Finally, the letter indicates that Terex is "aware that [Iowa Parts] ha[d] been contacting Cedarapids' customers and suppliers in an attempt to interfere with the contractual relationships which currently exist with Cedarapids." *Id.* Additionally, Cindy Ledford, the parts manager for CMI Roadbuilding, testified at her deposition that Iowa Parts directly competed with CMI Roadbuilding and its predecessors from its inception. *See id.* at 8-9. Ledford expressed confusion as to how Iowa Parts was consistently able to provide quotes to CMI Roadbuilding's customers before CMI Roadbuilding. She testified, "I never understood how I could struggle getting information, but they—and I know they knew the product line, you know. They did know the product line, but it was—it just seemed funny to me how they would always have the information quicker than I would." *Id.* at 9.

Finally, Iowa Parts alleges that it has advertised its services in several trade magazines between 2002 and 2014. *See* Iowa Parts Motion Statement of Facts ¶¶ 23-24. It implies that Terex has also placed advertisements in the same publications. *Id.* ¶ 25. Iowa Parts also attended a tradeshow, World of Asphalt, in 2003 wherein it displayed poster-sized versions of its advertisements. *Id.* ¶ 26. Iowa Parts alleges that Steve O'Neil, a Terex employee, was present at the World of Asphalt convention in 2003 and visited the Iowa Parts booth. *Id.* ¶ 27.

Somewhat recently, Iowa Parts transitioned from selling smaller replacement components to larger components. *Id.* ¶ 28. This transition changed the value of the component parts at issue dramatically—from around $50 to $250 per part to $300,000 to $400,000 per item. *Id.* ¶ 29. On February 4, 2016, Edwin Sauser, the product manager for Terex Minerals Processing Systems, emailed David Emerson of CMI Roadbuilding stating the following: "Iowa Parts is building silos and bag houses through Climate

Engineering using Cedarrapids drawings. Are they building these for your group?" *See* CMI Motion Appendix at 87. Emerson attached several photographs to the email, in part depicting several technical drawings. *Id.* at 88-90. Soon thereafter, on February 22, 2016, CMI Roadbuilding instituted the instant action.

## VI. ANALYSIS

CMI Roadbuilding seeks partial summary judgment on the issue of liability on all of its claims. *See* CMI Motion at 1. The only issue remaining for trial would be the measure of damages. In the alternative, CMI Roadbuilding requests that the court enter an order, pursuant to Federal Rule of Civil Procedure 56(g), stating all of the material facts not genuinely in dispute, such that the parties may treat them as established at trial. *Id.* Iowa Parts argues that genuine issues of material fact exist as to all of CMI Roadbuilding's claims arising under the DTSA and UTSA, and further argues that CMI Roadbuilding cannot succeed as a matter of law on its conversion and unjust enrichment claims. *See generally* Iowa Parts Resistance.

Iowa Parts argues that it is entitled to summary judgment on all of CMI Roadbuilding's claims because CMI Roadbuilding brought suit outside of the applicable statutes of limitations on all claims. *See* Iowa Parts Motion at 1. It further argues that summary judgment is appropriate because CMI Roadbuilding failed to take reasonable steps to maintain the secrecy of its trade secrets, and cannot assert any claim under the DTSA because the applicable conduct occurred prior to the DTSA's passage. *Id.* at 1-2. Finally, Iowa Parts argues that it is entitled to summary judgment on CMI Roadbuilding's conversion claim because CMI Roadbuilding cannot prove an essential element of the claim. *Id.* at 2. CMI Roadbuilding argues that the discovery rule applies to its claims and CMI Roadbuilding had no reason to know of Iowa Parts's alleged misappropriation until well within the statute of limitations. *See generally* CMI Resistance. It further argues that it has taken reasonable steps to maintain its secrets and that Iowa Parts has admitted that

it committed some "act" after the passage of the DTSA, making the claim cognizable. *Id.* Finally, it argues that it can establish each element of conversion. *Id.*

The court shall first briefly summarize the DTSA and UTSA and their protections. The court will then consider whether Iowa Parts is entitled to summary judgment on its statute of limitations defense. Finally, if appropriate, the court shall consider whether CMI Roadbuilding is entitled to summary judgment on the issue of liability on its claims.

## A. *The DTSA and UTSA*

The DTSA creates a federal private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. Under the DTSA, trade secrets include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing." *Id.* § 1839(3). However, such information only qualifies as a trade secret if:

> the owner thereof has taken reasonable measures to keep such information secret; and . . . the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

*Id.*

In turn, the term "misappropriation" means "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "disclosure or use of a trade secret of another without express or implied consent" where such person "used improper means to acquire knowledge of the

trade secret," "at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . derived from or through a person who had used improper means to acquire the trade secret; . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or . . . derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret" or "before a material change of the position of the person, knew or had reason to know that . . . the trade secret was a trade secret; and . . . knowledge of the trade secret had been acquired by accident or mistake." *Id.* § 1839(5). As defined by the DTSA, "improper means" "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." *Id.* § 1839(6).

Similarly, the UTSA provides means for a trade secret holder to obtain an injunction and monetary damages against an infringer. The UTSA allows the holder of a trade secret to obtain an injunction when "actual or threatened misappropriation" of the secret occurs. Iowa Code § 550.3(1). The measure of damages is "the actual loss caused by the misappropriation, and the unjust enrichment caused by the misappropriation which is not taken into account in computing the actual loss." *Id.* § 550.4(1). If the misappropriation is "willful and malicious," courts "may award exemplary damages . . . not exceeding twice the award made" for actual loss and unjust enrichment. *Id.* § 550.4(2).

Under the UTSA, a "trade secret" is "information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process" that both "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use," and that has been "the subject of efforts that

are reasonable under the circumstances to maintain its secrecy." *Id.* § 550.2(4). This inquiry is a mixed question of law and fact, with the legal portion of the inquiry being whether the information is the type of information that can qualify, categorically, as a trade secret. *See Econ. Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641, 648 (Iowa 1995). The fact portion of the inquiry asks whether the information derives independent economic value from its secrecy and whether reasonable efforts to maintain its secrecy were expended. *Id.* at 648-69.

A person can misappropriate a trade secret in several ways laid out in the UTSA. Misappropriation means: "Acquisition of a trade secret by a person who knows that the trade secret is acquired by improper means;" "Disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret;" "Disclosure or use of a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret;" "Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;" "Disclosure of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use;" and "Disclosure or use of a trade secret by a person who, before a material change in the person's position, knows that the information is a trade secret and that the trade secret has been acquired by accident or mistake." Iowa Code § 550.2(3). In turn, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." *Id.* § 550.2(1).

## B. Statute of Limitations

Iowa Parts argues that it is entitled to summary judgment because CMI Roadbuilding discovered, or should have discovered, that Iowa Parts was utilizing the Engineering Documents at some time prior to the time permitted by the statute of limitations.[3] *See* Brief in Support of the Iowa Parts Motion (docket no. 139-1) at 18. In particular, Iowa Parts argues that the number of employees who departed CMI Roadbuilding and its predecessors[4] to work for Iowa Parts, the fact that Ledford voiced her concerns about Iowa Parts to her superiors, the letter from CMI Roadbuilding to King soon after he began working at Iowa Parts informing him that he may not utilize CMI

---

[3] Iowa Parts also argues that CMI Roadbuilding does not own the trade secrets at issue because Terex never transferred any of the assets that it acquired from its acquisition of Cedarapids to CMI Terex, which in turn sold assets to CMI Roadbuilding. *See* Iowa Parts Resistance at 6-7. However, the testimony of Eric Cohen, the general counsel for Terex, establishes the chain of ownership of the Engineering Documents and it is his opinion that CMI Roadbuilding obtained an ownership interest in the intellectual property related to the asphalt plants through the asset sale from CMI Terex to CMI Roadbuilding. *See* CMI Motion Appendix at 53-56, 62; *see also* CMI Resistance Appendix (docket no. 144-3) at 29-30. Therefore, Iowa Parts cannot defeat the CMI Motion on these grounds.

[4] CMI Roadbuilding does not argue that whatever knowledge its predecessors in interest had of Iowa Parts's alleged misappropriation should not be imputed to it. *See generally* CMI Resistance. Thus, the court shall assume, without deciding, that information known by Terex, CMI Terex and/or Cedarapids could start the clock on the statute of limitations. Even if the court reached the issue, it would conclude that CMI Roadbuilding has imputed knowledge of everything that its predecessors in interest knew with respect to the trade secrets. First, CMI Roadbuilding purchased the trade secrets from CMI Terex, along with the rights and responsibilities thereto. Any information with respect to the trade secrets should have been sought and disclosed during due diligence for the acquisition. Furthermore, absolving CMI Roadbuilding of the knowledge of its predecessors in interest could open the door to fraudulent transfers of trade secrets between related business entities for the purpose of restarting the clock on stale claims of misappropriation. However, because the parties do not argue this issue, the court need not decide it, and instead shall simply assume that CMI Roadbuilding is charged with the knowledge of its predecessors in interest.

Roadbuilding's confidential information and the fact that Iowa Parts notoriously competed with CMI Roadbuilding, including circulating advertisements and attending trade shows, demonstrates that CMI Roadbuilding should have known, prior to the time permitted by the statute of limitations, that Iowa Parts was allegedly utilizing the Engineering Documents. *See id.* at 18-30.

CMI Roadbuilding argues that Iowa Parts must explicitly identify when it acquired each individual Engineering Document and demonstrate that CMI Roadbuilding should have known of its acquisition or use, otherwise it would essentially "give[] Iowa Parts *carte blanche* authority to continue to steal the Engineering Documents in perpetuity." CMI Resistance at 7. CMI Roadbuilding also argues that the key turning point in the instant action is when Iowa Parts recently began manufacturing larger component parts—it was only at that time that CMI Roadbuilding was put on notice that Iowa Parts must have been misappropriating the Engineering Documents. *See id.* at 8-9. CMI Roadbuilding further asserts that it first became aware of Iowa Parts's alleged misappropriation in February of 2016, when it received the email from Sauser. *Id.* at 10. Finally, CMI Roadbuilding argues that the 2002 letter to King "addresses many subjects that naturally flowed from his departure from Terex employment" and did not necessarily imply that CMI Roadbuilding knew that King was acquiring and using its trade secrets. *Id.* at 11. CMI Roadbuilding further maintains that Iowa Parts has provided no evidence that any employee of CMI Roadbuilding ever saw or was aware of Iowa Parts's advertisements or presence at trade shows. *Id.* at 12.

### 1.  *Applicable Law*

Under both the DTSA and UTSA, a party must commence an action within three years of the time that the misappropriation is actually discovered or should have been discovered. *See* 18 U.S.C. § 1836(d) ("A civil action under subjection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect

to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered."); Iowa Code § 550.8 ("An action for misappropriation under this chapter must be brought within three years after the misappropriation is discovered or should have been discovered by the exercise of reasonable diligence."). Both statutes treat a continuing violation as a single claim for the purposes of determining when an action becomes time barred. *See* 18 U.S.C. § 1836(d) ("For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation."); Iowa Code § 550.8 ("For purposes of this section, a continuing misappropriation constitutes a single claim."). The so-called discovery rule written into the UTSA and DTSA tolls the statute of limitations for a party without actual knowledge of the misappropriation if there exists no facts sufficient to demonstrate that the party should have discovered the misappropriation at an earlier time.

Iowa law treats claims of conversion as injuries to property, making the statute of limitations on such a claim five years. *See, e.g.*, *Husker News Co. v. Mahaska State Bank*, 460 N.W.2d 476, 477 n.2 (Iowa 1990) (assuming that a five-year statute of limitations applied); *see also Estate of Pepper* ex rel. *Deeble v. Whitehead*, 686 F.3d 658, 665-66 (8th Cir. 2012). The Eighth Circuit has stated that the discovery rule should apply to statutes of limitations on conversion claims arising under Iowa law. *See Whitehead*, 686 F.3d at 666 ("Iowa applies the discovery rule to toll a statute of limitations." (citing *Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 231 (Iowa 2006)). *But see Husker News Co.*, 460 N.W.2d at 479 (refusing to apply the discovery rule of claims of commercial conversion arising under Iowa's version of the Uniform Commercial Code). Iowa law treats an unjust enrichment claim as a claim arising under an unwritten contract, and, thus, is also subject to a five-year statute of limitations. *See Dolezal v. City of Cedar Rapids*, 326 N.W.2d 355, 360 (Iowa 1982) ("We hold plaintiff's unjust enrichment claim is . . . subject to the five-year statute of limitations on unwritten contracts."). Both parties agree

that the discovery rule should apply to CMI Roadbuilding's conversion and unjust enrichment claims. *See* Brief in Support of the Iowa Parts Motion at 15.

Under the discovery rule, the statute of limitations on an action is tolled until such time as the injured person has actual or imputed knowledge of all the elements of a cause of action. *See Gabelli v. S.E.C.*, 568 U.S. 442, 449 (2013) ("Under [the discovery] rule, accrual is delayed 'until the plaintiff has "discovered"' his cause of action. . . . And we have explained that '[a cause of action] is deemed to be discovered when, in the exercise of reasonable diligence, it could have been discovered.'" (citations omitted)); *Hook v. Lippolt*, 755 N.W.2d 514, 521 (Iowa 2008) (quoting *Franzen v. Deere & Co.*, 377 N.W.2d 660, 662 (Iowa 1985)). If a party should have been aware of the existence of their cause of action, they are said to be on inquiry notice of the same. "A party is placed on inquiry notice when a person gains sufficient knowledge of facts that would put that person on notice of the existence of a problem or potential problem." *Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 736 (Iowa 2008).

After a party is placed on inquiry notice, it is charged with knowledge of all facts that a reasonably diligent investigation would have disclosed. *Id.* Thus, inquiry notice imposes a positive duty of investigation once a party becomes "aware that a problem exists" and such duty arises "even though the person may not have knowledge of the nature of the problem that caused the injury." *Id.* (quoting *Sparks v. Metalcraft, Inc.*, 408 N.W.2d 347, 352 (Iowa 1987)); *see also Hallett Const. Co.*, 713 N.W.2d at 231 ("A claimant can be on inquiry notice without knowing 'the details of the evidence by which to prove the cause of action.'" (quoting *Vachon v. State*, 514 N.W.2d 442, 446 (Iowa 1994))). Thus, "the duty to investigate does not depend on exact knowledge of the nature of the problem that caused the injury. It is sufficient that the person be aware that a problem existed." *Woodroffe v. Hasenclever*, 540 N.W.2d 45, 48-49 (Iowa 1995) (quoting *Franzen*, 377 N.W.2d at 662-63). "Issues of due diligence and constructive knowledge

depend on inferences drawn from the facts of each particular case. . . . When conflicting inferences can be drawn from the facts, summary judgment is inappropriate." *Whitehead*, 686 F.3d at 666 (alteration in original) (quoting *Kraciun v. Owens-Corning Fiberglass Corp.*, 895 F.2d 444, 447 (8th Cir. 1990)). "[I]gnorance of specific legal rights or failure to seek legal advice should not toll the [] notification period." *DeBrunner v. Midway Equip. Co.*, 803 F.2d 950, 952 (8th Cir. 1986) (quoting *McClinton v. Ala. By-Products Corp.*, 743 F.2d 1483, 1486 (11th Cir. 1984)).

The instant action was filed on February 22, 2016. *See* Complaint (docket no. 2). Thus, under the DTSA and UTSA, CMI Roadbuilding must not have had actual or imputed knowledge of a violation prior to February 22, 2013 for the claim to survive summary judgment. Similarly, CMI Roadbuilding must not have had actual or imputed knowledge that Iowa Parts converted the trade secrets or was unjustly enriched by the same prior to February 22, 2011 to survive summary judgment. Though Iowa Parts bears the burden of demonstrating that the statute of limitations bars CMI Roadbuilding's claims, the burden rests on CMI Roadbuilding to adduce evidence that, even with reasonable diligence, a genuine issue of fact exists as to whether it knew or should have known of the misappropriation prior to 2011 or 2013. *See John Q. Hammons Hotels, Inc. v. Acorn Window Sys., Inc.*, 394 F.3d 607, 610 (8th Cir. 2005) ("While a statutory time bar is an affirmative defense that must be established by the defendant, a plaintiff claiming the application of the delayed discovery rule has the burden of proving it." (quoting *Estate of Montag v. TH Agric. & Nutrition Co.*, 509 N.W.2d 469, 470 (Iowa 1993))); *see also Whitehead*, 686 F.3d at 666 ("The plaintiff bears the burden of pleading and proving the applicability of the discovery rule, but when a defendant claims a statute of limitations defense in a summary judgment motion, the court reviews the evidence presented in the light most favorable to the plaintiffs as nonmoving parties." (alterations and quotation marks omitted) (quoting *Kraciun*, 895 F.2d at 445-46)). Therefore, summary judgment

against CMI Roadbuilding is appropriate if a reasonable jury could only conclude that CMI Roadbuilding knew or should have known of the potential violation before February 22, 2013 for the DTSA and UTSA claims, and before February 22, 2011 for the conversion and unjust enrichment claims. *See Hammons Hotels*, 394 F.3d at 610.

### 2. *Actual or Inquiry Notice*

As an initial note, the court rejects CMI Roadbuilding's contention that Iowa Parts must, with specificity, list each Engineering Document obtained and tie each document to facts suggesting that CMI Roadbuilding should have known that Iowa Parts was in possession of the same. The DTSA and UTSA both explicitly state that, for the purposes of application of the statute of limitations, a continuing misappropriation is treated as a single claim. *See* 18 U.S.C. § 1836(d); Iowa Code § 550.8. In doing so, the statutes reject the "continuing violation" theory, present in other statutory schemes, under which continued disclosure or use of a trade secret would permit claims for other misappropriations occurring within the limitations period, even if prior misappropriations are not actionable, or would permit a claim for all misappropriations so long as one occurred within the limitations period. The clear intent of the statutes is that a plaintiff placed on notice that another may be utilizing its trade secrets may not sleep on its rights and should understand that there is a risk that another may commit additional acts of misappropriation, whether with the same trade secret or related trade secrets. *See, e.g.*, *Gognat v. Ellsworth*, 224 P.3d 1039, 1046-47 (Colo. App. 2009), *aff'd*, 259 P.3d 497 (Colo. 2011) (applying Colorado's version of the UTSA); *Cadence Design Sys., Inc. v. Avant! Corp.*, 57 P.3d 647, 651 (Cal. 2002) (applying California's version of the UTSA); *Adcor Indus., Inc. v. Bevcorp, LLC*, 411 F. Supp. 2d 778, 786 (N.D. Ohio 2005), *aff'd*, 252 F. App'x 55 (6th Cir. 2007) (applying Ohio's version of the UTSA); *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 654 (N.D. Cal. 1993) (applying California's version of the UTSA).

Here, the method and subjects of the claimed misappropriation are consistent—CMI Roadbuilding alleges that Iowa Parts has consistently induced various third parties to supply it with Engineering Documents related to the production of component parts for asphalt plants and related equipment, allowing Iowa Parts to use the information in the Engineering Documents to directly compete with CMI Roadbuilding in a manner in which it could not otherwise compete. These alleged trade secrets[5] are undoubtedly "related" such that notice, either actual or constructive, that Iowa Parts was obtaining and using one Engineering Document would start the statute of limitations as to all use of the Engineering Documents. The reason for this is clear. If CMI Roadbuilding had become aware of the alleged misappropriation the instant that Iowa Parts acquired its first Engineering Document and taken prompt and successful remedial action, no further acts of misappropriation would have occurred, either with respect to that Engineering Document or others. The DTSA and UTSA's rejection of the continuing violation theory require this outcome.

The court finds that no reasonable jury could find that CMI Roadbuilding should not have discovered that Iowa Parts was using the Engineering documents prior to 2011. It is uncontested that, shortly after Terex acquired Cedarapids, it was determined that the aftermarket parts department was going to be shut down. King and those working for him began sending out packets of information to numerous vendors on a daily basis. It is further undisputed that CMI Roadbuilding viewed such documents as confidential and as trade secrets. At his deposition, King testified that he believed that Terex was preparing nondisclosure agreements for these vendors. *See* CMI Motion Appendix at 72. King agreed that the nondisclosure agreement essentially stated: "we're [Terex] giving you [the

---

[5] The parties contest whether the Engineering Documents constitute trade secrets. For the purposes of the statute of limitations defense, the court shall assume that the Engineering Documents constitute trade secrets.

vendor] these confidential documents of the company for your use in giving us a quote to potentially build this product for us and solely for us." *Id.* After King and other employees had contacted multiple vendors, his employment with Terex terminated and he soon thereafter went to work for Iowa Parts in or about May of 2002, just one month after Iowa Parts was incorporated. King also admitted that, since 2002, Iowa Parts has been obtaining plans and specifications, including the Engineering Documents, from various vendors and using the same to produce parts to compete with CMI Roadbuilding. *See* Iowa Parts Reply Appendix (docket no. 150-3) at 4.

After moving to Iowa Parts, King received a letter from Terex reminding him of his continuing obligations of confidentiality to the company and stating, that Terex was "aware that [he] ha[d] been contacting Cedararpids' customers and suppliers in an attempt to interfere with the contractual relationships which currently exist with Cedararpids." CMI Motion Appendix at 184. While the court agrees with CMI Roadbuilding that the letter may have been sent as a matter of course, it still demonstrates that CMI Roadbuilding was aware of the potential for former employees to abscond with or utilize trade secrets and, more importantly, was aware that King had been in contact with the company's vendors after he left its employ.

Iowa Parts established itself as a direct competitor to CMI Roadbuilding almost as soon as it began operating. Cindy Ledford, who was employed by CMI Corporation and later Terex, testified at her deposition that "right from the beginning" of her employment at CMI Terex, roughly 2001 or 2002, Iowa Parts had been one of CMI Terex's biggest competitors. *See* Iowa Parts Resistance Appendix (docket no. 146-3) at 134. She stated that she became aware of Iowa Parts when customers would mention Iowa Parts on phone calls with her as she began to source parts for the new line. *Id.* She testified as follows:

> A.      That, I never understood. I never understood how the
>         customers could call me and be asking for a quote from
>         me, and I'm struggling to find the Cedar Rapids stuff

and the information, and they would tell me, "Well,
I've already got a quote from Iowa Parts, and it's this
amount of money."

So I never understood how I could struggle getting
information, but they—and I know they knew the
product line, you know. They did know the product
line, but it was—it just seemed so funny to me how they
would always have the information quicker than I
would.

*Id.* Ledford further testified that she voiced her concerns to her immediate supervisor or
manager at that time. *Id.* Apparently, no further investigation was made.

Additionally, Joseph Musil, a former CMI Terex and Cedarapids employee and
consultant for CMI Roadbuilding, testified at his deposition that, based on his forty-five
years of experience, a person could not build component parts from the freely accessible
information available to Iowa Parts in 2002—namely, "assembly and erection drawings,"
"parts manuals" or "operator or maintenance manual[s]." *See* Iowa Parts Motion
Appendix at 50. He opined that a person could not completely reverse engineer a part
because it would not tell the person "what material it was made out of, . . . what hardness
it was hardened to or tempered to . . . [or] many things you need to make a part of
identical quality and service to the part that was actually originally built." *Id.* at 51. He
also noted that reverse engineering may produce "a part that looks somewhat like [the
original], but it would not be functionally equivalent to the part that was originally
provided or engineered." *Id.* at 52. Musil further testified as follows:

Q.     . . . [W]e're talking about someone skilled in the art, so
someone that has the same knowledge and experience
as yourself. Are you saying they wouldn't be able to
. . . [reverse engineer a part]?

A.     I myself would have a very difficult time even with
[forty-five] years experience, and in spite of all my best
efforts probably without originally being involved in the

design have trouble copying something that I hadn't
done originally.

*Id.* at 51. When confronted with a part that an Iowa Parts employee had supposedly reverse engineered, Musil stated that the employee "had learned a great deal from [him]." *Id.*

Further, even if CMI Roadbuilding was not actually aware of Iowa Parts's website and advertisements, it is still charged with knowledge of them because a reasonable investigation would have uncovered the advertisements available at that time. *See Buechel*, 745 N.W.2d at 736; *see also Woodroffe*, 540 N.W.2d at 48-49. In particular, CMI Roadbuilding would have uncovered Iowa Parts's statements on its website that it can provide parts for CMI Roadbuilding's asphalt plants to OEM specifications. That King admitted CMI Roadbuilding never gave Iowa Parts permission to use this phrase is irrelevant, *see* Iowa Parts Motion Appendix at 44, because such a statement would undoubtedly have tipped CMI Roadbuilding off that Iowa Parts was marketing its after-market parts as being, essentially, the exact same as CMI Roadbuilding's OEM parts. According to Musil in his deposition, such a fact would be impossible without access to the original engineering specifications. *See Woodroffe*, 540 N.W.2d at 51-52. The fact that Iowa Parts was touting the essential equivalence of its parts and CMI Roadbuilding's parts, along with the other facts adduced above, is sufficient as a matter of law to place CMI Roadbuilding on notice that Iowa Parts may be misappropriating trade secrets. No reasonable jury could find otherwise. That CMI Roadbuilding may not have actually become aware that Iowa Parts was in possession of its trade secrets until 2016 after Sauser sent the email inquiring about the silos is irrelevant. The statutes of limitations explicitly incorporate the discovery rule, which the court has discussed at length.

Thus, shortly after Iowa Parts was formed, CMI Roadbuilding was aware that King had left Terex to join Iowa Parts and had been in contact with certain Terex vendors, who had recently and rapidly acquired a large number of Terex's proprietary documents.

Ledford approached her superiors with a concern about the rapidity with which Iowa Parts could prepare quotes of CMI Roadbuilding's own parts. At least one employee at CMI Terex believed that Iowa Parts could not have easily created component parts without access to the company's proprietary information, because the freely available information and reverse engineering would not have been sufficient to create a quality component part. Additionally, a reasonable investigation would have revealed that Iowa Parts was advertising its parts as meeting OEM specifications, which it could not actually produce without the use of trade secrets. That CMI Roadbuilding may not have actually been aware of the advertisements does not defeat summary judgment, because any reasonable investigation would have, at the very least, revealed Iowa Parts's website and advertisements. No reasonable jury could conclude that CMI Roadbuilding did not have actual or imputed knowledge of the existence of a problem or potential problem. *See Buechel*, 745 N.W.2d at 736. Shortly after incorporation, and certainly prior to eleven years of continuous operation, competition and alleged misappropriation, CMI Roadbuilding knew or should have known that Iowa Parts was utilizing the Engineering Documents.

The court is similarly unpersuaded by the distinction CMI Roadbuilding apparently draws between the smaller component parts that Iowa Parts was originally producing and the larger scale components that it subsequently began producing. CMI Roadbuilding implies that the use of the Engineering Documents only occurred or became imperative after such shift occurred. *See* CMI Resistance at 8-9. CMI Roadbuilding fails to identify exactly when Iowa Parts shifted its focus from smaller to larger-scale components—thus it is impossible for the court to determine whether such a shift occurred within the statute of limitations in the first instance. Furthermore, this distinction is entirely without import. It is undisputed that, from its inception, Iowa Parts was utilizing its contacts with CMI Roadbuilding's vendors to produce component parts. *See, e.g.*, CMI Motion Appendix

at 75-77. Musil also testified that he believed that even simpler component parts would require more than simple reverse engineering to properly produce. *See* Iowa Parts Motion Appendix at 51-52. It is clear that Iowa Parts's method of producing parts, whether they be smaller component parts or the larger component parts, has remained constant throughout the years. There was no significant shift in the way that Iowa Parts was allegedly utilizing CMI Roadbuilding's trade secrets, thus CMI Roadbuilding's distinction does not hold water.

Because the court has found that CMI Roadbuilding discovered or should have discovered the misappropriation of the Engineering Documents well before the statute of limitations cutoff, the court need not address whether Iowa Parts is entitled to summary judgment because CMI Roadbuilding failed to maintain the secrecy of its trade secrets. Furthermore, the court need not address whether CMI Roadbuilding is entitled to summary judgment on the merits of its claims, nor need the court issue a Rule 56(g) order. The parties shall bear their own costs and attorneys' fees.

## C. Conversion

Even if the statute of limitations did not time bar CMI Roadbuilding's conversion claim, summary judgment on such claim is appropriate on an independent ground. Iowa Parts argues that CMI Roadbuilding cannot prevail on its conversion claim as a matter of law because conversion claims are unavailable for takings of information or intellectual property and because CMI Roadbuilding cannot demonstrate all elements of its claim. *See* Brief in Support of the Iowa Parts Motion at 34-36. CMI Roadbuilding argues that Iowa courts have not foreclosed a cause of action for conversion based on intellectual property and that it has sufficiently demonstrated all elements of its conversion claim. *See* CMI Resistance at 16-19.

Conversion is the "civil equivalent" of theft. *State v. Hollinrake*, 608 N.W.2d 806, 808 (Iowa Ct. App. 2000). "The essential elements of conversion are: 1) ownership by

the plaintiff or other possessory right in the plaintiff greater than that of the defendant; 2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and 3) damage to plaintiff." *Matter of Estate of Bearbower*, 426 N.W.2d 392, 394 n.1 (Iowa 1988); *see also Hollinrake*, 608 N.W.2d at 808 ("Conversion is the intentional exercise of control over property 'which so seriously interferes with the right of another to control it that the actor may justly be required to pay . . . the full value of the chattel.'" (alteration in original) (quoting Restatement (Second) of Torts § 222A(1))).

The parties discuss several Iowa cases at length when arguing whether Iowa law recognizes a conversion claim based on intellectual property. In one such case, *Kendall/Hunt Publ'g Co. v. Rowe*, the Iowa Supreme Court affirmed the district court's ruling that conversion did not extend to protect "the design and layout" of a book. 424 N.W.2d 235, 247 (Iowa 1988). In *Kendall/Hunt*, the plaintiff, a publishing company known as Kendall, sued its former employee, Rowe, after it learned that Rowe had organized a competing business and had published a second edition of one of Kendall's books that was essentially "a photo-reproduction of the Kendall text, with only minor changes." *Id.* at 238. The Iowa Supreme Court held that the photo-reproduction and publication of the text did not constitute conversion because "Kendall was never deprived of the use of its design and layout of [the text] by either Rowe or [his competing company]. No harm was done to their design and layout . . . . Their control of the layout . . . was never removed from them. It is true that Rowe and [his company] made use of Kendall's design and layout but this usage was not incompatible with Kendall's own continuing usage." *Id.* at 247 (alterations omitted). The Iowa Supreme Court also noted the industry practice of photo-reproduction of texts, and opined that Rowe was acting in good faith when he published the text. *Id.*

In *Primmer v. Langer*, the Iowa Court of Appeals found that shipping rate, contract and customer information taken or destroyed by a former employee upon the termination of his employment with the plaintiff was not properly the subject of a conversion claim. 856 N.W.2d 382, 2014 WL 4930456, at *7 (Iowa Ct. App. 2014). Primmer was a corporation specializing in the brokerage of shipment loads for common carriers. *Id.* at *1. Langer was a broker for Primmer who, after relations with Primmer soured, absconded with "rates and contract information and shredded information regarding customer contracts, customer load history, quoted [freight] lanes, and future lanes." *Id.* at *2. The Iowa Court of Appeals noted that Primmer had retained a copy of "all information" that Langer allegedly took or destroyed and that he "never deprived use of the information" to Primmer. *Id.* at *7. The Iowa Court of Appeals, citing *Kendall/Hunt*, concluded that "the information" at issue was not protected by conversion. *Id.*

Finally, in *Sioux Biochemical, Inc. v. Cargill, Inc.*, the United States District Court for the Northern District of Iowa eschewed a reading of *Kendall/Hunt* that categorically foreclosed any claim of conversion based on intellectual property. 410 F. Supp. 2d 785, 802 (N.D. Iowa 2005). The *Sioux Biochemical* court noted that the *Kendall/Hunt* decision was premised, not on an assumption that no intellectual property could ever be subject to a conversion claim, but on a consideration of the factors relevant to determining the seriousness of the interference with the plaintiff's possessory rights. *Id.* at 800-01. *Kendall/Hunt*'s statement that "the law of conversion does not apply," *Kendall/Hunt*, 424 N.W.2d at 247, to the layout of the printed material in that case, according to the *Sioux Biochemical* court, "relied on the specific application of the pertinent factors; it cannot be read . . . to mean that no claim of conversion can ever involve intellectual property," *Sioux Biochemical*, 410 F. Supp. 2d at 801.

Based on a review of these cases, the court agrees with CMI Roadbuilding that *Kendall/Hunt* and its progeny do not necessarily foreclose a plaintiff from asserting a

conversion claim for intellectual property or information. These cases generally focus on the seriousness of the defendant's interference with the plaintiff's possessory rights in determining whether a conversion claim is available. *See, e.g.*, *Kendall/Hunt*, 424 N.W.2d at 247. Iowa courts consider a variety of factors in determining the seriousness of a defendant's interference with a plaintiff's possessory rights, including the extent of the defendant's exercise of dominion or control, the intent to assert a right in fact inconsistent with the plaintiff's right of control, the extent and duration of the resulting interference with the plaintiff's right of control and the harm done to the chattel. *See id.* Cases such as *Kendall/Hunt* rely on the fact that the defendant's use of the intellectual property did not actually interfere with the plaintiff's right to independently control and utilize the information at issue. *See id.* ("Kendall was never deprived of the use of its design and layout of [the text] . . . No harm was done to their design and layout. Their control of the layout was never removed from them." (alterations omitted)); *Primmer*, 2014 WL 4930456, at *7 ("Richard Primmer admitted that Primmer retained a copy of all information Langer took and never deprived use of the information."). The same is true here. CMI Roadbuilding has never lost the ability to control and utilize the documents that it maintains. CMI Roadbuilding retains all of the Engineering Documents. Iowa Parts's use of the Engineering Documents, whether wrongful or otherwise, has not actually deprived CMI Roadbuilding of any of its trade secrets. No reasonable jury could conclude that Iowa Parts's alleged interference with CMI Roadbuilding's property was sufficiently serious to support a claim of conversion. Thus, while conversion claims on intellectual property are generally available, the undisputed facts of the instant action make summary judgment in Iowa Parts's favor appropriate.

### D.  Unjust Enrichment

Finally, even if CMI Roadbuilding's claim of unjust enrichment was not time barred, the court would find that Iowa Parts is entitled to judgment as a matter of law.

Iowa Parts argues that CMI Roadbuilding's claim for unjust enrichment must fail because an adequate remedy exists at law to rectify CMI Roadbuilding's grievances, such that an appeal to equity jurisdiction is unnecessary. *See* Brief in Support of the Iowa Parts Motion at 36. CMI Roadbuilding appears to argue that, because it is possible that its claims under the DTSA or UTSA may be foreclosed by one of Iowa Parts's asserted affirmative defenses, the court should not grant summary judgment on the unjust enrichment claim because there would be no remedies available at law to provide it relief. *See* CMI Resistance at 20-21. The court disagrees.

Unjust enrichment claims require that no adequate remedy at law exists to provide relief to the complainant. Where a party seeks damages pursuant to both a statutory claim, such as the DTSA claim or UTSA claim, and an equitable claim, such as the unjust enrichment claim, the existence of the statutory claims bars recovery on the equitable claim. This is true "even if recovery under the[] statutes is time-barred." *United States v. Bame*, 721 F.3d 1025, 1031 (8th Cir. 2013) (finding that, under Minnesota law, a time-barred cause of action arising under the fraudulent transfer statute precluded the plaintiff from asserting an unjust enrichment claim). As the Eighth Circuit stated in *Bame*, "it is the existence of an adequate legal remedy that precludes unjust enrichment recovery," not whether the plaintiff can pursue it in the present litigation. *Id.* CMI has cited no authority that Iowa courts would not follow this well-reasoned rule and the court is aware of none. Instead, the court is persuaded by Eighth Circuit precedent construing unjust enrichment claims under Minnesota law, which is substantially similar to Iowa law. *Compare ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305-07 (Minn. 1996) (listing the elements of an unjust enrichment claim under Minnesota law and noting that no claim in equity can lie when an adequate remedy at law would suffice), *with Stine Seed Co. v. A&W Agribusiness, LLC*, 862 F.3d 1094, 1101 (8th Cir. 2017) (listing the elements of an unjust enrichment claim under Iowa law).

Furthermore, CMI's argument appears to rest on the premise that its inability to secure relief on its statutory causes of action render such causes of action an inadequate remedy at law. *See* CMI Resistance at 21 ("Due to the number of defenses Iowa Parts has raised, it may be possible CMI Roadbuilding will not, at the time for entry of judgment in its favor, have an adequate legal remedy available to it."). The adequacy of a remedy at law is not determined after the merits of an underlying statutory claim has been decided—for that to be true would be to essentially impose *post hoc* liability after the case had already been litigated and give the plaintiff a proverbial second bite at the apple. The adequacy of a remedy at law, instead, must be determined irrespective of whether the causes of action available have been foreclosed on some other grounds. *See, e.g.*, *Bame*, 721 F.3d at 1031. The statutory remedies provided under the DTSA and UTSA are sufficient such that the court need not turn to equitable relief to remedy the wrong. *See Callender v. Skiles*, 591 N.W.2d 182, 186 (Iowa 1999) ("[E]quity does not establish the right to institute a particular action, but merely comes into play when such a right exists and the legal principles do not provide the needed relief."); *see also* 18 U.S.C. § 1836(b)(3)(B)(i)(II) (providing that a court may award "damages for any unjust enrichment caused by the misappropriation of a trade secret"); Iowa Code § 550.4 ("Damages may include . . . the unjust enrichment caused by the misappropriation . . . ."). Therefore, CMI Roadbuilding faces an insuperable bar to recovery on its unjust enrichment claim, and summary judgment in Iowa Parts's favor is appropriate.

## VII. CONCLUSION

For the foregoing reasons, it is hereby **ORDERED**:

(1)     The CMI Motion (docket no. 134) is **DENIED**;

(2)     The Iowa Parts Motion (docket no. 139) is **GRANTED**;

(3)     The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendant
        Iowa Parts, Inc. and against Plaintiffs CMI Roadbuilding, Inc. and CMI
        Roadbuilding, Ltd.; and

(4)     The Clerk of Court is **DIRECTED** to terminate all outstanding motions.

The Final Pretrial Conference is **CANCELLED** and the trial date is **VACATED**.
The parties shall bear their own costs and fees.

**IT IS SO ORDERED.**

**DATED** this 8th day of December, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA